THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EILEEN HANSON,<br><br>              Plaintiff,<br><br>     v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,<br><br>              Defendant. | CASE NO. C16-0568-JCC<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

This matter comes before the Court on Defendant State Farm Mutual Automobile Insurance Company's motion for partial summary judgment (Dkt. No. 11). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

## I.    BACKGROUND

This case arises out of a personal injury claim for underinsured motorist (UIM) bodily injury benefits. On August 9, 2013, Plaintiff Eileen Hanson was struck by a vehicle driven by an underinsured motorist. (Dkt. No. 1-1 at ¶ 4.2; Dkt. No. 12-2.) Plaintiff has automobile insurance with Defendant. (Dkt. No. 12-4.) Her policy provided Personal Injury Protection (PIP) medical expense benefits up to $10,000. (*Id.*; Dkt. No. 12-3.) Plaintiff filed a claim with Defendant and her PIP benefits were exhausted approximately nine months after the accident. (Dkt. No. 12-3.)

In June 2014, Plaintiff's counsel, Kyle Olive, advised Defendant that Plaintiff would be asserting a UIM claim under her automobile insurance policy. (Dkt. No. 13 at ¶ 2.) On September 17, 2014, Plaintiff sent Defendant a UIM bodily injury demand package. (*Id.* at ¶ 4.) Defendant's claim handler, Tamara Beason, noticed that some of the medical records referenced in the demand letter were not included in the package. (*Id.* at ¶ 5.) Mr. Olive sent a letter on October 13, 2014, agreeing to an extension of time for a response to the demand letter and enclosing a disk with all of Plaintiff's post-accident records. (*Id.*; Dkt. No. 13-3.) Mr. Olive also asserted a third-party liability claim against the at-fault and underinsured driver, and reached an agreement with the at-fault driver's insurance carrier for $50,000 in October 2014. (Dkt. No. 13 at ¶ 2; Dkt. No. 13-2.)

On November 17, 2014, Ms. Beason, on behalf of Defendant, offered Plaintiff $50,367.16 in "new money" (money in addition to her PIP benefits and money from the at-fault driver), waiver of Defendant's PIP reimbursement claim, and fees to Mr. Olive. (Dkt. No. 13 at ¶ 6.) Defendant's internal records indicate it evaluated Plaintiff's UIM claim in a range of values between $50,367.16 and $70,367.16. (Dkt. No. 17-11.) On November 28, 2014, Mr. Olive asked for a written explanation of the initial offer. (Dkt. No. 17-15.) Ms. Beason responded on December 4, 2014, and outlined the initial offer: $13,174 for all of Plaintiff's medical expenses, $47,192 for all of Plaintiff's income loss, and $50,000 in general damages for a total of $110,367.16. (Dkt. No. 13-4.) Once the PIP benefits and at-fault driver agreement were deducted, the net UIM amount was $50,367.16. (*Id.*) Ms. Beason stated the "evaluation considered all of the information outlined in your settlement demand package. Based upon our review of your demand and the records, it does not appear that we need any additional information. *However, we are willing to consider any new information that you wish to provide concerning your client's injuries and treatments*." (*Id.*) (emphasis added). On December 11, 2014, Defendant paid Plaintiff the initial offer, $50,367.16 in new money. (Dkt. No. 13-5.) The letter attached to the check stated Defendant looked "forward to continuing to negotiate a final

settlement. *If there is any new information that you feel would be beneficial to this end, please feel free to contact [Defendant].*" (*Id.*) (emphasis added).

On January 14, 2015, Mr. Olive sent a letter to address the "discrepancy" between Defendant's and Plaintiff's valuation of the claim. (Dkt. No. 17-18.) Mr. Olive requested that Defendant use "additional tools" to ascertain the full value, including "requesting additional information from [Plaintiff], seeking information from a vocational rehabilitation specialist, seeking information from a physical capabilities examiner, [and] interviewing healthcare providers that have provided treatment to [Plaintiff]." (*Id.*) Mr. Olive sent a second letter on February 4, 2015, asking for a response to the first letter. (Dkt. No. 17-21.) Ms. Beason sent a letter dated February 11, 2015, noting her attempts to contact Mr. Olive prior to his second letter. (Dkt. No. 13 at ¶ 8.) In a letter dated February 12, 2015, Mr. Olive apologized for not returning Ms. Beason's calls, and asked that she let him know in writing what additional information Defendant would like to have to evaluate Plaintiff's claims further. (Dkt. No. 13-6.)

Over the next few months, the representatives corresponded about a possible independent insurance examination and agreed to an in-person interview on April 9, 2015, at Mr. Olive's office. (Dkt. No. 13 at ¶¶ 9–10; Dkt. No. 17-29.) After the meeting, Ms. Beason believed that Plaintiff was still struggling with mental processing based upon what Plaintiff told her and Ms. Beason's observations. (Dkt. No. 18 at 34.) However, Plaintiff reported that she had no current physical complaints. (Dkt. No. 13 at ¶ 10.)

At the April 9 meeting, Mr. Olive stated that he would get a report on whether Plaintiff's condition was permanent. (*Id.* at ¶ 11.) However, Defendant never received this report. (*Id.*) Instead, Mr. Olive requested that Defendant pay for a report from Plaintiff's treating neuropsychologist Gina Formea, Ph.D., (Dkt. No. 17-33), which Defendant declined to do, (Dkt. No. 17-34). Defendant already had Dr. Formea's January 2014 report, which indicated that Plaintiff had "very good abilities" and that "there was no indication for any long term residuals in brain functioning related to the accident." (Dkt. No. 20 at 3; Dkt. No. 27-1 at 6.)

By June 2015, Ms. Beason determined that an independent neuropsychological examination was appropriate. (*Id.* at ¶ 11) She selected neuropsychologist Alan Breen, Ph.D., but Mr. Olive objected because Dr. Breen was allegedly biased. (Dkt. No. 17-37.) Mr. Olive claims in his declaration that his concern was "premised upon knowledge obtained from colleagues that [Dr. Breen's] opinions were usually at odds with those of a client's treating health care provider." (Dkt. No. 17 at ¶ 55.) Eventually, Dr. Breen evaluated Plaintiff on August 26 and August 28, 2015. (Dkt. No. 28-1.)

Dr. Breen completed his 17-page report on October 5, 2016. (*Id.*) Dr. Breen concluded that Plaintiff was not suffering from any cognitive impairment or other neuropsychological sequela from the August 9, 2013 collision. (*Id.* at 15) ("This assessment provides no basis for any injuries or mental health diagnoses associated with the motor vehicle accident."). Plaintiff scored high on verbal and reading comprehension, had normal motor and sensory skills, and was average in immediate and delayed memory. (*Id.* at 11–12.) Dr. Breen noted the "disconnect between [Plaintiff's] subjective complaints and the objective circumstances of her accident was highlighted by Dr. Formea who reported that while [Plaintiff] had some score variability in her neuropsychological assessment there was 'no indication for any long term residual in brain functioning related to the accident.'" (*Id.* at 15; *see also* Dkt. No. 27-1 at 6 (Dr. Formea report).) He referenced Dr. Formea's conclusion that "self-expectation" could lead someone to have subjective complaints like Plaintiff's. (Dkt. No. 28-1 at 15.) He noted that Plaintiff's "expectations were likely to have been simulated by comments made to her the Sunday after the accident when two physician parishioners [at Plaintiff's church] told her 'You might have a concussion' and warned her about 'brain swelling.' The medical record fails to support either of the overly causal conjectures." (*Id.*)

After reviewing Dr. Breen's report, Defendant's evaluation of Plaintiff's claim did not change because Dr. Breen's report stated Plaintiff had no permanent brain injury. (Dkt. No. 18 at 46.) However, on December 8, 2015, in a further attempt to settle and resolve the case,

Defendant offered another $10,000 in new money, bringing the total compensation to $120,367.16. (Dkt. No. 13 at ¶ 13.) Mr. Olive rejected that offer and requested that Defendant pay its remaining UIM bodily injury limit, $49,633. (*Id.*; Dkt. No. 17-44.)

On March 24, 2016, Plaintiff filed this action. (Dkt. No. 1-1.) Defendant now moves for partial summary judgment on Plaintiff's extra contractual claims: (1) violation of Washington's Insurance Fair Conduct Act (IFCA), Wash. Rev. Code § 48.30.015, *et seq.*; (2) bad faith; and (3) violations of Washington's Consumer Protection Act (CPA), Wash. Rev. Code § 19.86, *et seq.* (Dkt. No. 11; *see* Dkt. No. 1-1 at 14–16.)

## II.     DISCUSSION

### A.     Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

//

### B. Insurance Fair Conduct Act

IFCA allows an insured who is "unreasonably denied a claim for coverage or payment of benefits by an insurer [to] bring an action in the superior court of this state to recover the actual damages sustained." Wash. Rev. Code § 48.30.015. In *Perez-Crisantos v. State Farm Fire and Casualty Co.*, 389 P.3d 476, 479 (Wash. 2017), the Washington Supreme Court considered whether an insured can sue her insurance company under IFCA for Washington regulatory violations. The court held that insureds have no private cause of action under IFCA against insurers for violating the Washington Administrative Code (WAC). *Id.* at 482–83. "The insured must show that the insurer unreasonably denied a claim for coverage *or* that the insurer unreasonably denied payment of benefits. If either or both acts are established, a claim exists under IFCA."[1] *Id.* (citing *Ainsworth v. Progressive Cas. Ins. Co.*, 322 P.3d 6, 20 (Wash. 2014)).

Here, Plaintiff alleges Defendant violated IFCA by violating the WAC, including, but not limited to WAC § 284-30-330. (Dkt. No. 1-1 at ¶ 10.3.) However, the Washington Supreme Court has made clear that IFCA violations cannot be premised on violations of the WAC. *Perez-Crisantos*, 389 P.3d at 483. Therefore, the Court DISMISSES Plaintiff's IFCA claim and GRANTS Defendant's motion for partial summary judgment on this issue.

### C. Bad Faith and Consumer Protection Act

Plaintiff alleges Defendant acted in bad faith when it "unreasonably, unfairly, and attempted to overreach" Plaintiff. (Dkt. No. 16 at 18.) She also claims her CPA claim is based on both Defendant's bad faith actions and its "interrelated violations" of the WAC. (*Id.* at 24.) Therefore, the Court will address the bad faith and CPA claims together.

---

[1] Defendant makes a curious claim that insureds can only bring IFCA claims for denials of coverage, not denials of benefits. (Dkt. No. 11 at 11–12) (citing *Perez-Crisantos*, 389 P.3d at 482). However, Defendant seems to be cherry-picking language. *See id.* ("IFCA creates a cause of action for unreasonable denials of *coverage* and also permits treble damages in some circumstances.") The Washington Supreme Court goes on to make clear that IFCA covers both denials of coverage and benefits. *See id.* at 483; *Bauman v. Am. Commerce Ins. Co.*, 2017 WL 635777, at *2 (W.D. Wash. Feb. 16, 2017).

Claims of insurer bad faith "are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages proximately caused by any breach of duty. In order to establish bad faith, an insured is required to show the breach was unreasonable, frivolous, or unfounded." *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 668 (Wash. 2008).

In order to recover under the CPA, a plaintiff must prove "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986) (en banc). "Even if incorrect, a reasonable denial of coverage by the insurer is not a violation of the CPA." *Gingrich v. Unigard Sec. Ins.*, 788 P.2d 1096, 1102 (Wash. Ct. App. 1990) (citing *Villella v. Public Employees Mut. Ins. Co.*, 725 P.2d 957, 965 (Wash. 1986)). Unlike an IFCA claim, a CPA claim can be predicated on a violation of WAC § 284-30-330. *Perez-Crisantos*, 389 P.3d at 483 (violation of WAC § 284-30-330 satisfies elements 1 and 2).

In sum, both bad faith and CPA violations turn on the reasonableness of the insurer's actions. Specifically, Plaintiff alleges Defendant acted in bad faith and violated the CPA in five instances, discussed below.

1. <u>Failure to Include Value for Future Damages</u>

Plaintiff alleges that Defendant unreasonably refused to pay benefits for future damages it accepted she had suffered, which also evidences a violation of WAC § 284-30-330(4). (Dkt. No. 16 at 18–19.) However, the evidence shows that Defendant's employees, including Ms. Beason, *documented* Plaintiff's complaints about her alleged persistent injuries. (Dkt. No. 13 at ¶¶ 9–10; Dkt. No. 17-14 at 7) (noting that after discussion with a medically trained State Farm employee that Plaintiff "*may* likely have some level of cognitive difficulties") (emphasis added)). Moreover, four and a half months after Plaintiff's accident, Dr. Formea, Plaintiff's treating neuropsychologist, found that there was "no indication for any long term residuals in brain functioning related to the accident." (Dkt. No. 27-1 at 6.) Three years later, Dr. Breen concluded

the same. (Dkt. No. 28-1 at 15) ("This assessment provides no basis for any injuries or mental health diagnoses associated with the motor vehicle accident."). Defendant considered both reports. Therefore, no reasonable juror could conclude that Defendant acted unreasonably by not awarding future damages based on the evidence it had when evaluating the claim. Plaintiff's *post hoc* argument and evidence provided after filing this action that she suffers an ongoing injury does not weigh on this reasonableness inquiry. (*See* Dkt. No. 16 at 11–12.) It is undisputed that this information was not available to Defendant at the time it was evaluating Plaintiff's claim. The Court DISMISSES Plaintiff's bad faith and CPA claim on Defendant's alleged failure to include value for future damages and GRANTS Defendant's motion for partial summary judgment on this issue.

2. <u>Failure to Contact Plaintiff's Medical Providers</u>

Plaintiff alleges that Defendant's failure to contact Plaintiff's "treating medical providers to obtain additional 'support' it purportedly needed for her claim in the face of *repeated* requests that it do so" further evidences bad faith. (Dkt. No. 16 at 19.) However, the evidence demonstrates that Defendant believed it did not need more information, but communicated its interest in receiving any new information about Plaintiff's health on multiple occasions. (Dkt. No. 13-4; Dkt. No. 13-5.) Moreover, Defendant was already in possession of Dr. Formea's report and considered it in its evaluation of Plaintiff's claim. (Dkt. No. 13 at ¶ 4.) Ms. Beason also met with Plaintiff one-on-one and set up an independent examination with Dr. Breen. (Dkt. No. 13 at ¶¶ 9–10, ¶13.) Plaintiff's argument that in order to have conducted a reasonable investigation, Defendant must have considered every possible medical opinion is unpersuasive. "The focus is not on what could have been done, but on what was actually done by the insurer." *Bridgham-Morrison v. Nat'l Gen. Assurance Co.*, 2016 WL 2739452, at *6 (W.D. Wash. May 11, 2016). Insurance companies may justifiably rely on Plaintiff's counsel to apprise them of any changed medical circumstances. *Id.* The Court DISMISSES Plaintiff's bad faith and CPA claim on Defendant's alleged failure to contact Plaintiff's medical providers and GRANTS Defendant's

motion for partial summary judgment on this issue.

3. Reliance on Dr. Breen's Medical Report

Plaintiff alleges Defendant's "reliance on a financially interested insurance examiner, Dr. Breen, further evidences unfair conduct and an attempt to overreach" Plaintiff.[2] (Dkt. No. 16 at 20.) However, Mr. Olive only makes conclusory accusations in his declaration that "[Dr. Breen's] opinions were usually at odds with those of a client's treating health care provider." (Dkt. No. 17 at ¶ 55.) Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan*, 497 U.S. at 888–89. Moreover, Dr. Breen's opinion is consistent with that of Dr. Formea, Plaintiff's treating neuropsychologist. (*Compare* Dkt. No. 28-1 at 15 (Dr. Breen) *with* Dkt. No. 27-1 at 6 (Dr. Formea).) The Court concludes Defendant's use of an independent neuropsychologist was reasonable and does not demonstrate bad faith. The Court DISMISSES Plaintiff's bad faith and CPA claim on Defendant's reliance on Dr. Breen's medical report and GRANTS Defendant's motion for partial summary judgment on this issue.

4. Concealment of Undisputed Benefits

Plaintiff alleges Defendant acted unreasonably and unfairly when it "concealed its internal decision as to the amount of benefits" owed to Plaintiff and refused "to pay even the additional $10,000 worth of benefits disclosed and accepted" by Plaintiff. (Dkt. No. 16 at 21.) She claims this is also a violation of WAC §§ 284-30-330(1) and 350(1). (*Id.* at 23.) However, the Washington Supreme Court held that disparity between an ultimate award on a UIM claim

---

[2] Plaintiff also argues in a footnote that Defendant's decision to use Dr. Breen was not required by the policy. (Dkt. No. 16 at 21 n.3.) "Relegating substantive arguments to footnotes is dangerous business." *F.D.I.C. v. Red Hot Corner, LLC*, 2014 WL 5410712, at *1 (D. Nev. Oct. 22, 2014). "If an argument is worth making, a party should put the argument in the body of its brief." *Bach v. Forever Living Prods. U.S., Inc*., 473 F. Supp. 2d 1127, 1132 (W.D. Wash. Feb. 13, 2007). Plaintiff's counsel is discouraged from engaging in this practice in the future, and the Court will not address the arguments raised in footnotes. *See* W.D. Wash. Local Civ. R. 7(e)(6) ("The court may refuse to consider any text, including footnotes, which is not included within the page limits.").

and an insurer's initial offer does not establish bad faith or a CPA violation; "[t]here has to be something more." *Perez-Crisantos*, 389 P.3d at 483. To establish bad faith conduct by an insurer, Plaintiff must show that the insurer had "no reasonable justification" for its evaluation of her claim. *Starczewski v. Unigard Ins. Grp.*, 810 P.2d 58, 62 (Wash. Ct. App. 1991). "The insured may present evidence that the insurer's alleged reasonable basis was not the actual basis for its action, or that other factors outweighed the alleged reasonable basis." *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1278 (Wash. 2003) (en banc). The insurer is entitled to summary judgment if "reasonable minds could not differ that its denial of coverage [or benefits] was based upon reasonable grounds." *Id.* at 1277.

In this case, Defendant paid Plaintiff $50,367.16 in new money UIM benefits within a month of completing its evaluation, (Dkt. No. 13-5), and offered $10,000 more in December 2015, bringing the total compensation to $120,367.16, (Dkt. No. 13 at ¶ 13). Defendant's records indicate it evaluated Plaintiff's UIM claim in a range of new money values between $50,367.16 and $70,367.16. (Dkt. No. 17-11.) However, Defendant did not have a duty to disclose that it had valued her claim up to $70,357.16. Due to the "adversarial relationship inherent in the fact that the insurer steps into the shoes of the underinsured motorist" there is no "enhanced duty" of a UIM insurer to its insured. *Schreib v. Am. Family Mut. Ins. Co.*, 129 F. Supp. 3d 1129, 1135 (W.D. Wash. 2015) (citing *Ellwein v. Hartford Acc. & Indem. Co.*, 15 P.3d 640, 647 (Wash. Ct. App. 2001), *overruled other grounds by Smith*, 78 P.3d at 1278). Therefore, offering the lower end of the UIM claim range as an initial first offer is not unreasonable. Plaintiff has failed to provide evidence of something more than a disparity between the ultimate award on the UIM claim and Defendant's initial offer. *See Perez-Crisantos*, 389 P.3d at 483. Again, missing facts will not be presumed. *See Lujan*, 497 U.S. at 888–89. Therefore, the Court DISMISSES Plaintiff's bad faith and CPA claim on Defendant's alleged concealment of undisputed benefits and GRANTS Defendant's motion for partial summary judgment on this issue.

//

### 5. Delay in Investigation

Finally, Plaintiff alleges Defendant's "claims handling and investigatory delays evidence bad faith" and a failure to properly investigate in violation of WAC §§ 284-30-330(1) and 330(2). (Dkt. No. 16 at 23, 24.) Specifically, Plaintiff alleges Defendant did not promptly investigate when it "failed to take any independent action . . . to assess the amount of benefits owed." (*Id.* at 23.) However, as decided above, Defendant did not have a duty to contact Plaintiff's medical providers. Insurance companies may justifiably rely on plaintiff's counsel to apprise them of any changed medical circumstances. *Bridgham-Morrison*, 2016 WL 2739452, at *6. Based on the evidence before the Court, any delay after the initial settlement offer was due to Mr. Olive's lack of response. (*See* Dkt. No. 13-6.) After the initial settlement was challenged and paid, Ms. Beason met with Plaintiff in person, (Dkt. No. 13 at ¶¶ 9–10; Dkt. No. 17-29), and set up an independent neuropsychological examination, (Dkt. No. 13 at ¶ 13; Dkt. No. 28-1.) No reasonable juror could conclude there was an unreasonable, frivolous, or unfounded delay evidencing bad faith. Therefore, the Court DISMISSES Plaintiff's bad faith and CPA claim on Defendant's alleged delay in investigation and GRANTS Defendant's motion for partial summary judgment on this issue.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion for partial summary judgment on Plaintiff's IFCA, bad faith, and CPA claims (Dkt. No. 11) is GRANTED. Defendant also requests costs. (Dkt. No. 11 at 16.) However, the Court declines to award costs and fees without briefing and documentation. If Defendant wishes to collect fees and costs, it must file a motion for attorney fees and costs.

//
//
//
//

DATED this 6th day of June 2017.

John C. Coughenour
UNITED STATES DISTRICT JUDGE